**CONFLICTING ELECTIONS BY TENANTS IN COMMON.**

Circuit Court of Lucas County.

MARY E. BURCH AND CHARLES A. THATCHER v. WILLIAM BROOKS ET AL.*

Decided, 1909.

*Partition—Proper Procedure Where Inconsistent and Conflicting Elections Are Made—Good Faith of One Without Means for Carrying Out an Election.*

1. It is not error in an action for partition for the court to refuse to accept inconsistent and conflicting elections by parties in interest, and in lieu thereof adopt the procedure of ordering a sale.
2. Bad faith can not be assumed upon an election to take by a party in interest who is without means of his own with which to make

---

* Affirmed without opinion, 82 Ohio State, 441.

good the obligations assumed under an election to take, where it appears that he is able to make arrangements for meeting the obligations through the aid of others.

*G. B. Keppel* and *Gilbert Harmon,* for plaintiff in error.

*George B. Orwig, Raymond T. Garrison, Brown, Geddes, Schmettau & Williams, Erskine H. Potter* and *Harry Levison,* contra.

WILDMAN, J.; PARKER, J., and KINKADE, J., concur.

This is a proceeding in error, resulting from the judgment and order of sale in the court below in a partition proceeding.   Partition was sought by a tenant in common of seven acres of land fronting on Auburn avenue in this city.   The proceeding was begun on the 29th day of August, 1907.   After the order of partition and the appointing of commissioners, they made return that the property could not be divided without injury to the rights of the parties, and it then stood in the position contemplated by the statute as to what action may be taken where property is so indivisible.   The statute provides in Sections 5762-5764, R. S., inclusive, for the election by one or more of the tenants in common to take the property at the value as appraised by the commissioners.

The statute is a blank as to what proceedings shall be taken in case of conflicting elections.   In speaking of one or more of the owners electing to take the property and the order of the court for a deed to such purchaser electing, the Legislature either contemplated the individual election by one of the tenants in common, or the joint election by one or more, but it did not contemplate the election by one to take the whole of the property for himself and the election by another to do the same, because, of course, that sort of a proceeding would defeat itself.   It would be impossible to carry it out, and under such circumstances the courts have, I think, uniformly adopted the procedure of ordering a sale, refusing all the conflicting elections.

The question does not seem at any time to have reached the Supreme Court, but so far as I am advised the lower courts have

taken .the course stated. In the case at bar, after the commissioners had made their return, appraising the property at $7,000, elections were filed. On April 15, 1908, Mary E. Burch filed her election, Roland A. Scott, one of the tenants in common, owner of one twenty-fourth, I believe, of the property, filed an election on the 18th day of April, three days after Mary Burch. That is to say, there was an election in her name. I will call attention later to the dispute with regard to whether it was authorized by her. On the 18th day of May, Charles A. Thatcher, who was a brother of Mrs. Burch, elected. On the 22d day of May, Chester A. Scott, a tenant in common, holding one forty-eighth, if my memory serves me—the fraction is of no consequence—also elected. On the 25th day of May, Mrs. Burch and Mr. Thatcher, her brother, filed a joint election.

On the 25th day of May, according to the docket, or the 1st of June, according to the journal as shown by the transcript of entries, the court of common pleas found that there were several elections, and accordingly overruled them and ordered a sale of the property. A motion was filed in behalf of Mary E. Burch and Charles A. Thatcher to set aside this order of the court, and that motion was overruled. Although there is this discrepancy between the journal and the docket, of course there was no ocasion for filing this motion, until the court had made the order complained of—the order in which the court recognized the several elections as inconsistent, one with another, and therefore ordered a sale. And we think it quite apparent that the joint election of Mrs. Burch and Mr. Thatcher, although it appears to have been made on May 25th, was not made until after and because the court made the order to which I have referred.

Two entries were filed upon the 1st of June by counsel for one of the parties, and the transcript indicates that the judgments were entered on these dates, both the judgment overruling the elections and the subsequent order, directing sale. They were in fact evidently made upon the 25th day of May and before the joint election of Mrs. Burch and Mr. Thatcher. But without regard to that, we think the court was justified in treating the

elections which had been previously made and filed as being an election by each tenant in common filing such election to take the whole of the property and not to take it in connection with some one else.

Upon the motion to set aside these orders, which was heard some time in July, a bill of exceptions was preserved, stating in the ordinary form: "Be it remembered," etc., "this cause coming on to be heard upon the motions and the several elections" (stating them) "and the order of the court overruling the elections and the motion to set aside the order of sale" (including this procedure in one statement), "the following evidence was offered," reciting the same; but it does not appear that any of such evidence was given prior to the action of the court which was complained of as wrong. It does not appear from the testimony of Mr. Thatcher that he intended his original election to be in connection with that of Mrs. Burch, nor is there any testimony that Mrs. Burch meant hers to be that of herself and Mr. Thatcher, a thing not apparent on the face of it. It does not appear that these matters were called to the attention of Judge Morris at the time when he made the original order.

It is claimed that the original elections of Mrs. Burch and Mr. Thatcher were meant to be joint; but the election of Mrs. Burch, as I have stated, called for the deed of the whole property to her. It was signed by Charles A. Thatcher as her attorney, and the individual election of Mr. Thatcher filed on the 18th day of May, does not mention Mrs. Burch as joined with him in it. This is signed by his associate partner as his attorney. Here were two elections, as clearly individual elections as it was possible to make them on their face, and whether the parties had it in contemplation to own the property afterwards in common is of no consequence. They were asking to have the deeds made in accordance with the individual elections. Mr. Thatcher was asking to have the deed of the whole property made to him; Mrs. Burch was, through her attorney, Mr. Thatcher, asking to have the deed of the whole property made to her.

If we throw out all the other forms of election, we see no reason why the court should not have made the order it did on the 25th day of May, that is to say, it would be so if the ostensibly joint election had not been filed on the 25th of May. But as I have already indicated, we think the order of the court was really made before the filing of the joint election, and it so appears on the appearance docket.

But there were other elections. An election was made in behalf of Roland A. Scott on the 18th day of April, under a power of attorney, which although questioned, has some evidence tending to sustain it as a valid authority.

Again, disregarding all these contentions, we still have before us the election of Chester A. Scott, made on the 22d day of May, three days before the order of the court, if it was made on the 25th, or nine days before if it was made on the 1st of June; long enough before, so it must be taken into account as an election.

Chester A. Scott, it is said by the testimony of the bill of exceptions and in the arguments of counsel, was a young man who had just arrived at majority, having no means, working on a salary or wage of $70 a month, and it is said that his election was not made in good faith. He made some sort of an arrangement with one Mr. Coates, by which the latter was to take the property off his hands and pay him $45 more than the $7,000, the appraised value of the property. That was evidently all the profit that Chester A. Scott was to get out of it. He was to get $45 for the advance over the appraisal of the property.

Now it is claimed that Mr. Coates is sort of an interloper here. He comes in and asks for a substitution; he also files an election after he is made a party. It is said that he is not a proper party. They were all trying to make their calling and election sure, but in the end there was no way out of the confusion other than for them all to fail.

Let us consider for a moment the election of Chester A. Scott: Is the election in bad faith simply because the young man has no means of his own with which to pay the purchase price? If he has provided the wherewithal with which it is to be paid, and it

is quite clear here that Mr. Coates was going to furnish him with $7,000 to make his election good and pay for the property, why should he not have the right as a tenant in common to elect to take the property at the low appraisement and get the benefit of the difference. Was he to be barred of any possible rights in the property because of his poverty, letting some tenant in common who had a plethoric purse go in and take it? We think that every tenant in common is given by the statute this right to elect, without regard to whether he has a large exchequer, provided he is making the election in good faith and that when the time comes, he have the money in hand to carry it out.

Now, it does not at all appear here that this young man did not intend to carry out this arrangement. On the contrary, it very clearly indicated that he was going to carry it out, and that he had the substantial backing of Mr. Coates.

It may properly be added that after Judge Morris' rulings upon the matter and after he had made this order of sale, an affidavit of prejudice was filed and another judge made the final ruling after hearing all the evidence, and refused to overrule the order which had been made by Judge Morris. We think that he was correct in so doing and that his judgment should be affirmed.

We find no error in the proceedings, and judgment of affirmance will be entered, but without penalty.